[Civil No. 4700.   Filed June 12, 1944.]

[149 Pac. (2d) 668.]

C. J. POWERS, Applicant, v. CONSOLIDATED VULTEE AIRCRAFT CORPORATION, Defendant Employer, PACIFIC EMPLOYERS INSURANCE COMPANY, Defendant Insurance Carrier, THE INDUSTRIAL COMMISSION OF ARIZONA, Respondents.

Mr. Otho Books and Mr. Arthur A. Tannenbaum, for Applicant.

Messrs. Knapp, Boyle and Thompson, for Defendant Employer.

Mr. Leo C. Guynn, for Defendant Insurance Carrier.

Mr. H. S. McCluskey and Mr. Fred O. Wilson, for Respondents.

STANFORD, J.—C. J. Powers, the petitioner for a writ of *certiorari* in this case, was employed by the Consolidated Vultee Aircraft Corporation at Tucson, Arizona, and said corporation was insured against liability for the payment of workmen's compensation by the Pacific Employers Insurance Company, one of the parties to this action, and all were subject to the jurisdiction of the Industrial Commission of Arizona. Petitioner was of the age of 58 years, and while employed by the Consolidated Vultee Aircraft Corporation on May 10, 1943, as a fitter and oxygen mechanic, claims to have injured the retina of his right eye by dropping a distance of approximately two feet to a cement floor. It was the duty of the petitioner to enter airplanes in the performance of his work, and on May 10th after he had finished his regular work he noticed the tail of the plane had been raised off the floor, or cement, to a point where the belly turrent was about five feet off the floor, and he left the plane by a hole in the floor by placing his hands on either side until he had reached a point about two feet above the cement when he dropped to the floor.

The further facts, as related by petitioner, show that when he dropped to the cement floor he injured his ankle and asked permission to go to the first aid station. He told the doctor there that: "I may have hurt my heel or ankle a little bit." The doctor said: "Put it in hot water and salt and give it plenty of exercise." In his examination by the Industrial Commission at Tucson he stated: "Yes, at the very time I fell, I felt a kind of sensation in my eye, I had no real pain or anything like that." And, at that examination he further testified:

"Q. Did you tell the doctor at the first aid station? A. No, I didn't say a word; I didn't think anything wrong with my eyes, but it had that kind of funny feeling and when I got home I noticed my glasses

weren't exactly right and the feeling, it got worse. . . . ''

The record shows that the petitioner went back to work regularly until the 19th day of May, 1943; that on said date he went to see Dr. Dake Biddle, an eye specialist at Tucson, and during the examination Dr. Biddle asked him the following questions:

"Did you have a blow in your eye? Did you receive a blow or a lick in your eye? And I just couldn't think of any such thing, I said, 'I don't know of any blow in my eye, no.' ''

Dr. Biddle prescribed and had him return in five days, which was on May 24th, and when he returned he was interviewed by both Dr. Biddle and Dr. Bernfeld, also an eye specialist. He stated that his eye had been improved during the five days he was away and the doctors prescribed for him again and requested that he stay at his home for two weeks longer, and, as we understand the testimony, when he returned after the expiration of those two weeks he asked the doctor the question, in an endeavor to determine the cause of the trouble with his eye, if the detachment of the retina of his eye could have been caused by a jar, by continuous jumping out of planes, and he testified that the doctors stated to him that it could have been caused in such a way.

Petitioner filed his application for an award under the Workmen's Compensation Law of our state, and the Industrial Commission of Arizona on November 4, 1943, entered its findings and award holding that:

"That the disability complained of by the applicant, of said eye, was not caused in whole or in part or contributed to by any accident arising out of or in the course of his employment, but was in all reasonable probability due to cystic degeneration, due to the age of the retina.''

And, on the denial of a motion for rehearing this court by a writ of *certiorari* granted after filing of petition, assumed jurisdiction to review the Findings and Award, and the question now before this court is whether the testimony of certain medical experts is sufficient to support the findings and award of the Commission.

The assignments presented by the petitioner, C. J. Powers, in this application are that the findings and award of the Commission are contrary to the evidence in the matter, and the Commission acted without jurisdiction and in excess of its conferred powers in denying a compensation award to the applicant Powers for a compensable injury shown by the evidence to have been caused by an accident arising out of and in the course of his employment.

Dr. Michael Bernfeld of Tucson, Arizona, an eye specialist, testified, in part, as follows:

"Q. Breaking away from possibilities and coming down to actualities and the case of Mr. Powers in particular, from the history he told you, assuming everything to be true, would you say this detachment was directly caused by this accident? A. From what I have been told?

"Q. From your findings and his history? A. Yes. When a man comes into the office and gives a straight forward history and statement and connects events, we presume that it is so, and that the detachment or whatever occurred is due to what preceded, and so I was of the opinion, after the examination and after Mr. Powers told me what had happened, that it was a direct and contributing factor, precipitating factor and cause of the detachment."

In a report to the Arizona Industrial Commission submitted by Dr. Michael Bernfeld dated June 15, 1943, he stated, in part, as follows:

"Mr. Powers came to our office on May 5–19–43 with complaint of partial loss of vision in the right

eye. Examination showed a flat detachment of the retina below in the right eye with vision of 20/200. He was questioned about a head injury or any injury which might have caused the trouble. At that time he could think of no contributory cause. He was told to go home and lie flat on his back in bed for five days and then return. He was to wear pinhole glasses during the time to limit the motion of his eyes.

"He returned on May 24, 1943, and the detachment was much improved with vision of 20/70. He continued wearing pinhole glasses and returned again on June 7, at which time the appearance was good and at this time on repeated questioning he asked if jumping out of an airplane onto the ground many times a day in the course of his work could have anything to do with his trouble. It seems likely that this may well have been a contributory cause in a person predisposed to the malady. . . . "

Dr. Paul Case, an eye specialist of Phoenix, Arizona, who testified for the Consolidated Vultee Aircraft Corporation and the Pacific Employers Insurance Company, testified on direct examination in this case before the Industrial Commission, in part, as follows:

"Q. Then, doctor, your answer would be to my rather lengthy question that a jar, such as Mr. Powers received on the 10th day of May, 1943, would not cause a separation of the retina? A. It would not."

And, he further testified:

"Q. In your opinion, could the jar which he sustained, according to his own testimony, have caused the condition you found? A. No.

"Q. Then, doctor, in your opinion would you say there is no relation between this man's condition and any jar which he may have sustained in the course of his employment? A. That is right."

On cross-examination Dr. Case stated that he, together with Dr. B. L. Melton, also an eye specialist of Phoenix, made a report to the Industrial Commission

in the matter of the instant case, the report reading, in part, as follows:

"Q. This is exactly as you worded it: (Reading) 'The only other question that arises is whether the separated retina is the result of an industrial injury. It is impossible to state dogmatically that it is or is not due to the injury. In our opinion it is extremely doubtful that the comparatively small jolt of a drop of two feet would be ample to cause a separation of the retina.' Do you want to change that statement? A. Naturally it is a joint report, and I merely had my own opinion, in my own mind, but I naturally— we have to make—we felt we wanted to make a joint statement."

Dr. B. L. Melton, on behalf of the Consolidated Vultee Aircraft Corporation and the Pacific Employers Insurance Company, testified as follows:

"A. Yes; I had him in two different days, and examined him on August 11th and 12th.

"Q. Doctor, on the basis of your examination of this man and your findings at that time, was the jar which he described to you he sustained getting in and out of planes sufficient to have caused the separation of the retina which you found? A. No, I do not believe the jar was sufficient to have caused it.

"Q. In your opinion, was this man's condition as you found it on August 11, 1943, was it in any way associated with his employment? A. I do not believe it was associated with the employment, but I feel that it was a coincidence. In most of the cases we attend we find no cause for it."

A case in point submitted by the respondents is *Wood* v. *W. E. Joyce Co.*, 228 App. Div. 729, 239 N. Y. Supp. 110, from which we quote the following:

" . . . The claimant fell from a stepladder early in May, 1928, while engaged in his work. Evidently he regarded the accident of little consequence, for he continued to work that day and the days following until about three weeks later (on May 23). Then,

while he was engaged in his work as a carpenter, he became suddenly blind in his right eye. Medical examination disclosed a detached retina. His eye had been bloodshot after the prior accident and there was some pain and some blurring of vision. The difficulty had been to identify the blindness with the earlier accident. It must, of course, depend upon medical testimony.

"Eminent oculists have been called but none is able to state with reasonable certainty that the source of causation was the fall from the stepladder. Some have eliminated practically every other cause, but, for some unexplained reason, hesitate to express a definite opinion that the origin of the detached retina was in the accident. They say it is 'possible,' but go no further. In the absence of other evidence leading to a reasonable conclusion this is not sufficient. *Matter of McLaughlin* v. *Curtis-Quillen Co.*, 223 App. Div. 208, 227 N. Y. Supp. 712; *Matter of Metz* v. *Gallagher*, 223 App. Div. 548, 229 N. Y. Supp. 65. The finding that the detachment of the retina of the right eye arose naturally and unavoidably from the accident is not sustained by the evidence, and the award should be reversed and the claim remitted, with costs against the State Industrial Board to abide the event."

While we are quoting the foregoing case, we are not relying on it as determinative of the issue in the instant case.

We are not deciding the issue in this case alone for this petitioner Powers. If so, our sympathy would go out to him and there would be no question about our opinion, but we must decide it from the standpoint of other cases that are to follow.

██ As we go over and over the testimony given, we find a weakness on the part of the case of the petitioner Powers in that he did not mention the fact that his eye was hurt sooner after he was injured, and while we have held that unless an injury was of sufficient importance to be brought to the attention of the employer soon after receiving same, the in-

jured person would not be required to give early notice, but in this case Powers testified that when he reached home he found he could not read because of the injury and an earlier visit to an eye specialist would have strengthened his case. In fact, he was hurt on the 10th and did not see the eye specialist until the 19th, nor did he report it to the first aid station when he went to it but, reported merely about the foot or ankle. Therefore, we have the evidence of Mr. Powers and Dr. Bernfeld definitely saying that this injury was caused by the continuous jumping from planes, and we have the evidence of Drs. Case and Melton to the effect that the injury could not have occurred from jumping from planes as related to Dr. Melton after his two time interview with Powers. The weakness in their testimony comes, however, in a report that they made to the Industrial Commission on August 11, 1943, as heretofore set forth, but in their testimony as given at the hearing on October 23 they are definite and certain that the injury could not have been caused in the way as related by petitioner. We then have the findings of the Industrial Commission and the many cases of our state holding that such findings shall be upheld when supported by competent and substantial evidence, and we feel that the evidence submitted as a basis of its award is competent and substantial and that the award should be, and is hereby, affirmed.

McALISTER, C. J., and ROSS, J., concur.